### W. E. GLADSTONE v. M. M. SWAIM.

(Filed 14 May, 1924.)

**Gaming—Money Received—Contracts—Stocks—Margin—Actions.**

Where the defendant has induced the plaintiff to purchase certain shares of stock, through himself, from his own broker, upon margin, the broker to carry the stock upon its hypothecation with him as collateral, and thereafter the defendant has his broker, unknown to the plaintiff, to sell the stock and place the proceeds to his own account, and uses the same and other moneys upon margin advanced from time to time by the plaintiff upon his representation that the price of this stock had decreased: *Held,* the plaintiff may recover of the defendant in his action the moneys the defendant had thus converted to his own use; and C. S., 2144, relating to gambling, etc., is not available to the defendant as a defense.

APPEAL by defendant from *Lane, J.,* at September Term, 1923, of FORSYTH.

Civil action, to recover of the defendant moneys belonging to the plaintiff, and which, it is alleged, the defendant converted to his own

use. It is further alleged that the defendant obtained a part of the funds, sought to be recovered, by false and fraudulent representations. Defense interposed upon the ground that the funds in question were obtained in connection with a gambling transaction, in violation of C. S., 2144.

There was a judgment of nonsuit in the Forsyth County Court; this was reversed on appeal to the Superior Court and the case remanded to the County Court for trial. From this judgment and order of the Superior Court the defendant appeals.

*Parrish & Deal for plaintiff.*
*Swink, Clement & Hutchins for defendant.*

STACY, J. The evidence, taken in its most favorable light for the plaintiff, the accepted position on demurrer or motion to nonsuit, tends to establish the following facts:

On 7 February, 1920, the defendant, who had been buying and selling stocks, through a broker in New York, came to the plaintiff, his intimate friend, and advised him to purchase some stock in the Willys-Overland Company, stating that it would pay six or eight per cent in dividends, with a chance for the stock to increase in value. The defendant told the plaintiff that he would not have to pay for the stock outright; that he could buy it on the defendant's credit and in his name; that the defendant's broker in New York, Joseph Walker & Son, would carry it upon an advanced payment of one-third of the market price, and that the plaintiff could hold the stock until the dividends and the increased value thereof amounted to enough to pay the balance of the purchase price. The plaintiff bought 25 shares of this stock, paid the market price thereof in full, and took it into his possession.

On 19 April, 1920, the defendant again advised the plaintiff to buy 100 shares of Willys-Overland Company stock, and told the plaintiff that if he would pay one-third of the purchase price his broker would pay the balance and hold the stock as collateral. With this understanding, the plaintiff delivered to the defendant his check for $405.00 and the 25 shares of stock already purchased, which was to be held by the broker as collateral for the payment of the balance of the purchase price of the 100 shares of said stock. The 100 shares of stock was actually purchased in the market at $24.25 per share and delivered to the broker.

On 30 April, 1920, eleven days thereafter, the defendant had the broker to sell the 125 shares of plaintiff's stock at $19.50 per share. This sale was made without plaintiff's knowledge or consent. The pro-

ceeds from said sale, after deducting the balance due the broker, left to the credit of the defendant in his account with the broker the sum of $408.75, which rightfully belonged to the plaintiff, and which was converted by the defendant to his own use.

Thereafter, on 30 May, 1920, the defendant came to the plaintiff and, concealing from him the fact that all of his stock had been sold, told the plaintiff that the broker was calling for additional collateral, as the market value of the Willys-Overland Company stock had decreased in value, and asked for $350.00 to prevent its sale by the broker. The plaintiff gave the defendant this amount, relying upon the truth of his statements and believing them to be true. On 5 October, 1920, under the same circumstances, the defendant demanded and received of the plaintiff the further sum of $350.00; and again, on 1 July, 1921, under the same circumstances, the defendant demanded and received of the plaintiff his promissory note for $500.00, the plaintiff not yet knowing that his stock had been sold in April of the previous year. On this note the plaintiff made payments in installments aggregating $350.00 before he discovered the fraud that had been practiced upon him.

The payments obtained by the defendant's false and fraudulent representations, after 30 April, 1920, amounted to $1,050.00, which, added to the sum of $408.75, the proceeds of the stock of the plaintiff sold by the defendant and converted to his own use, make a total of $1,458.75, the amount sought to be recovered by plaintiff in this suit.

At the conclusion of the plaintiff's evidence the County Court dismissed the action as in case of nonsuit, on the ground that the evidence disclosed a gambling contract, in violation of C. S., 2144. On appeal to the Superior Court, this was reversed and the cause remanded to the County Court for trial. From this judgment and order of the Superior Court the case comes to us for review.

If the foregoing be a correct recital of the transactions between the parties, which the jury alone may determine, then C. S., 2144, has no application to the case. *Harvey v. Pettaway,* 156 N. C., 375; 27 C. J., 1053; 12 R. C. L., 752. From the plaintiff's viewpoint, the action is one for pure fraud and conversion. The judgment and order of the Superior Court must be upheld. As the case goes back for another trial, we refrain from any discussion of the evidence. The defendant's testimony may tend to show a different state of facts.

Affirmed.